Filed 12/17/15  P. v Holland CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D068040 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB1102728) |
| MICHAEL FRED HOLLAND, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Michael M. Dest, Duke D. Rouse, Arthur R. Harrison and J. David Mazurek, Judges. Affirmed as modified and remanded with directions.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler and Julie L Garland, Assistant Attorneys General, Arlene A. Sevidal and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Michael Fred Holland of attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a); count 1), assault with force likely to produce great bodily injury (§ 245, subd. (a)(1); count 2), criminal threat (§ 422; count 3), attempted first degree residential robbery (§ 211; count 4) and first degree residential burglary (§ 459; count 5). It found true allegations that as to all counts, Holland personally used a dangerous and deadly weapon (§ 12022, subd. (b)(1)); as to counts one and four, he personally inflicted great bodily injury to Sandra Briones (§ 12022.7, subd. (a)); as to counts two and five, he personally inflicted great bodily injury to Michael Briones (§ 12022.7, subd. (a));[2] and, as to count five, a person was present in the residence within the meaning of section 667.5, subdivision (c)(21).

In separate proceedings, the trial court found true that Holland had suffered prior convictions for violating sections 664 and 266 (§ 667.5, subd. (b)) and Vehicle Code section 2001, subdivision (a). Further, he had suffered prior serious or violent felonies as a juvenile. (§§ 245, subd. (a)(1), 12022.70, 211.) It sentenced Holland to a determinate term of 19 years and an indeterminate term of 125 years to life.

Holland contends the trial court erroneously (1) found him competent to stand trial despite his mental health problems, thus violating his state and federal due process rights; (2) denied his motion to relieve appointed counsel under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*); (3) allowed him to represent himself at trial, thus depriving him of

---

[1]     Statutory references are to the Penal Code unless otherwise stated.

[2]     We will refer to the Brioneses by their first names to avoid confusion.

his constitutional rights to due process and the effective assistance of counsel as set forth in *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*); (4) limited his closing argument in violation of his constitutional right to self representation; (5) instructed the jury with CALCRIM No. 362 on consciousness of guilt from false statements and CALCRIM No. 372 regarding flight; (6) failed to instruct the jury on the elements of a criminal threat under section 422, which is unconstitutionally vague; (7) used his juvenile adjudication as a prior serious or violent felony conviction in violation of his due process and jury trial rights; (8) failed to stay the sentence on either the attempted robbery or burglary count under section 654; and (9) failed to stay the section 12022.7 enhancement on either the attempted murder (count 1) or the attempted robbery (count 4). Finding merit in the last contention only, we stay the great bodily harm enhancement on count 1. We otherwise affirm the judgment and remand with directions set forth below.

PROCEDURAL BACKGROUND

On June 22, 2011, the People filed an amended complaint charging Holland with the crimes listed above. Approximately a week later, Deputy Public Defender Rodrigo Curbelo expressed doubt about Holland's competency to stand trial; therefore, Judge Dest suspended proceedings and ordered a mental evaluation of Holland under section 1367. Judge Dest ordered two subsequent mental health evaluations of Holland.

On November 2, 2011, Judge Rouse denied both Holland's motion to represent himself, and his motion to relieve Deputy Public Defender Rodrigo Curbelo. At the preliminary hearing held that day, Deputy Public Defender Jason Oei represented Holland.

3

On November 10, 2011, Judge Mazurek granted Holland's motion to represent himself.

On January 5, 2012, trial commenced, with Judge Rouse presiding. Holland represented himself at all stages of trial, from voir dire to closing arguments. He cross-examined all of the seven witnesses the People called. On January 19, 2012, the jury convicted Holland.

On January 23, 2012, at Holland's request, the court appointed attorney Scott Brown to represent him in bifurcated proceedings regarding his prior convictions.

On September 21, 2012, Judge Rouse stated at a hearing that based on his doubts regarding Holland's mental competency, he had appointed a medical commission. Dr. Jenkins therefore evaluated Holland and concluded he was mentally competent to be tried. Defense counsel H. Charles Smith told the court, "If the court wants to go ahead and find [Holland] competent, that's fine too." The court made a competency finding and the prosecutor and defense counsel submitted on that finding. Judge Rouse also granted Holland's motion to represent himself.

On December 3, 2012, Judge Harrison denied Holland's motion for an investigator he sought to assist him in preparing a new trial motion.

On February 8, 2013, Judge Rouse denied Holland's motion for a new trial and pronounced judgment.

4

*Prosecution Case*

On the morning of June 15, 2011, Sandra awoke and found Holland—who she did not know and who had no right to be there—in her home located in the city of Highland, in San Bernardino County. She told him he needed to leave, and tried to get past him to reach the front door. Holland said, "Isn't this Greg's house? I thought this was Greg's house." Holland walked alongside her and said, "Fuck it, where is the money, lady? I want the money." Holland grabbed her shoulders and started pulling her back. She hit him. He lunged at her with a knife, slammed her against the refrigerator and on a table. He choked her as he pushed her on a couch. She blacked out and thought she was going to die. When she revived, she heard Holland screaming at her to give him some money. Sandra's husband, Michael, arrived home shortly afterwards and she yelled that Holland was choking her. Michael hit Holland, and Sandra managed to leave the house. Sandra called 911. She suffered a stab wound to her right arm, a finger cut, and abrasions and scratches to her nose, face and legs. Sandra identified Holland in a lineup and again at trial.

Michael testified that he returned home from work at around 7:45 a.m. on June 15, 2001. He entered the house and heard Sandra say, "Mike, Mike, he choked me out." Michael saw Holland's hand around Sandra's throat. Michael was afraid, thinking

---

[3]    We grant Holland's request to take judicial notice of his writ of habeas corpus petition.

Holland had brutally attacked Sandra. He was about to punch Holland, who held a knife. Holland looked at him and said, "You come any closer, she dies." Michael thought Holland would carry out his threat to kill Sandra. Michael saw blood on Sandra's shirt and went to the kitchen to grab a knife. In the ensuing fight, Michael punched Holland, who kicked Michael in the chest. Holland punched Michael in the face. Holland threw his jacket at Michael and ran out of the house. Michael chased Holland, who fled. Michael suffered a broken hand and a cracked tooth.

San Bernardino County Deputy Sheriff Aaron Halloway arrived on the scene. Holland saw him and tried to flee, but after a brief chase the deputy detained Holland. Holland gave the deputy a wrong name and date of birth.

Michael identified Holland in a field showup that morning. Holland had wounds consistent with his having attacked someone with a knife, and blood was on his clothing. A backpack containing Holland's bank deposit slip was found in the Brioneses' home.

*Defense Case*

Holland did not testify at trial. In closing arguments he presented his theory of the case that Sandra was caught in the act of having consensual sex with him: "[Michael Briones] snuck inside the house, see [Sandra and me] on the couch together, see the pantyhose. There's nothing to talk about. It's absolutely nothing to talk about. He

6

already hollered, 'What the F is going on?' That's the famous words of Ron Isley coming home to see that his woman is cheating."[4]

## DISCUSSION

### I.

### *Sufficient Evidence Supports the Trial Court's Finding that Holland was Mentally Competent to Stand Trial*

Holland contends insufficient evidence supported the court's finding he was competent to stand trial; therefore, the court violated his constitutional due process rights by making that finding.

A. *Background*[5]

As noted, three psychologists evaluated Holland for mental competency to stand trial. First, in a July 29, 2011 report, psychologist Christopher Michael concluded that

---

[4]    Holland summarizes his defense in his opening brief: "[I]n his [closing] argument, [he] presented an alternate scenario in which he may have been invited into the residence by Sandra for a romantic interlude and was attacked by a jealous husband."

[5]    Following oral argument, we requested the parties to brief the issue of whether the appellate briefs filed under seal should be unsealed. Having reviewed their letter briefs, we order unsealed those appellate briefs under California Rules of Court, rule 8.46(e)(3). The appellate court order sealing the briefs did not set forth the facts establishing a basis for so doing under California Rules of Court, rule 2.550(c)-(e). The trial court had not ordered Holland's mental health records prepared under Penal Code section 1368 to be filed under California Rules of Court, rule 2.550(c)-(e). Further, those records, which were the basis for the request for ordering the appellate briefs sealed, are presumptively public documents. (Advisory Com. com. foll. Cal. Rules of Court, rule 4.130 ["The expert reports, unless sealed under rule 2.550, are publicly accessible court documents."].) On appeal, Holland has put his mental health at issue; therefore, applying the criteria set forth in rule 2.550(c)-(e), we conclude that no overriding interest exists that overcomes the right of public access to the information contained in the mental health evaluations.

although Holland was sufficiently mentally competent to understand the nature of the criminal proceedings, he was not able to assist his attorney in the preparation of his own defense: "Finally, and likely as a result of his delusional convictions, Mr. Holland stated that he intended to serve as his own counsel. This path is inadvisably risky for most persons—let alone persons suffering from delusions that have incorporated the legal case itself." The court decided Dr. Michael's report "appear[ed] to be ambiguous" and therefore ordered another mental evaluation of Holland.

Second, in a September 7, 2011 report, psychologist Robert Suiter concluded Holland was competent to stand trial: "Despite his psychotic symptoms, Mr. Holland was able to describe quite adequately the nature of the current charges, the potential penalties if found guilty, and the parameters of a plea bargain. He was able to describe adequately the roles of the principal court officers and the adversarial nature of the proceedings. He described he did not trust his attorney, although mainly as he perceives his attorney has not spent sufficient time with him as there was no indication he considers there was any type of conspiracy against him with the court system. In total, his presentation was one of having some unrealistic expectations of his attorney rather than any dissatisfaction with him due to paranoid ideation. In that vein, Mr. Holland was also able to describe quite adequately how he would cooperate with his attorney in presenting his defense as it is this examiner's opinion he is able to do so in a rational manner."

Third, in an October 3, 2011, report, psychologist Tseday Aberra concluded Holland did not appear to have a "diagnosable primary psychiatric disorder," and he was competent to stand trial: "Mr. Holland's participation during this clinical interview and

8

administration of the R-CAI [Competency Assessment Instrument, Revised] was satisfactory.  He understood the nature of his charges and has the ability to fully understand and appreciate the purpose of the court proceedings being taken against him at the present.  Mr. Holland also has the ability to cooperate rationally with his counsel in presenting a defense."

Holland's public defender did not oppose the two psychologists' finding of competency:  "I would go ahead and submit on those reports and ask the court to set dates within the statutory time."  The prosecutor and defense counsel stipulated to those two psychological reports.  The court concluded based on the two most recent psychological evaluations that Holland was mentally competent to stand trial, and his mental health had "progressed in the last several months."

B.  *Legal Principles*

State law and federal due process prohibit the trial or conviction of a mentally incompetent criminal defendant.  (*People v. Dunkle* (2005) 36 Cal.4th 861, 885, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; § 1367, subd. (a).)  "A defendant is mentally incompetent" if a mental disorder prevents the defendant from understanding "the nature of the criminal proceedings" or assisting counsel "in the conduct of a defense in a rational manner."  (§ 1367, subd. (a).)  Section 1368 sets forth the procedure for implementing section 1367 protections.

The trial court plays a critical role in safeguarding the defendant's due process right not to be tried while incompetent.  It must suspend trial proceedings and conduct a competency hearing whenever substantial evidence exists, that is, evidence which raises a

9

reasonable or bona fide doubt concerning a defendant's competence to stand trial. (*People v. Rogers* (2006) 39 Cal.4th 826, 847.) Such evidence may be in the form of expert testimony but may also consist in whole or in part of " 'a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial,' " all of which are relevant and any one of which standing alone may be sufficient. (*People v. Ary* (2004) 118 Cal.App.4th 1016, 1024.)

Because a court must "consider all of the relevant circumstances" in determining whether there is substantial evidence of incompetency, defense "counsel's opinion is undoubtedly relevant." (*People v. Howard* (1992) 1 Cal.4th 1132, 1164) However, "[t]he opinion of counsel, without a statement of specific reasons supporting that opinion, does not constitute substantial evidence." (Cal. Rules of Court, rule 4.130(b)(2).)

Once the defendant is found "mentally competent," the criminal process resumes. (§§ 1370, subd. (a)(1)(A), 1372, subd. (a)(1).) " 'Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.' " (*People v. Lightsey* (2012) 54 Cal.4th 668, 690.)

On appeal, "[i]n resolving the question of whether, as a matter of law, the evidence raised a reasonable doubt as to defendant's mental competence, we may consider all the relevant facts in the record." (*People v. Young* (2005) 34 Cal.4th 1149, 1217.) The evidence is viewed in the light most favorable to the finding. (*People v. Dunkle, supra,* 36 Cal.4th at p. 885.) "Evidence is substantial if it is reasonable, credible and of solid value." (*Ibid.*)

10

C.  *Analysis*

We conclude the trial court did not err in finding Holland was mentally competent to stand trial.  As set forth above, although Dr. Michael concluded Holland was not mentally competent to stand trial, Drs. Suiter and Aberra subsequently evaluated Holland and concluded he was mentally competent to stand trial.  The court reviewed those findings and concluded Holland was competent.  Defense counsel stipulated to the reports and did not object to this finding of competency.  Among the most important factors courts consider in assessing whether a defendant is competent are the opinion and observations of defense counsel.  (See *Medina v. California* (1992) 505 U.S. 437, 450 ["defense counsel will often have the best-informed view of the defendant's ability to participate in his defense"].)

After Holland was permitted to represent himself, different judges presided over different motions in which Holland appeared, and Holland was represented by counsel at one point; yet, there is no evidence of " 'a substantial change of circumstances or . . . new evidence' casting serious doubt [on the finding that defendant was competent]." (*People v. Jones* (1991) 53 Cal.3d 1115, 1153.)  Neither the judges nor counsel sought a further mental competency test for Holland until after the verdict was entered.  Then, a psychologist again found Holland was mentally competent to participate in the court proceedings, and thereafter the court sentenced Holland.

Holland argues in his reply brief:  "[W]hile superficially seeming to understand the nature of the charges against him, he was obsessed with the prior conviction allegations and the prosecution's failure to produce a '[section] 995[, subdivision] (b)

11

packet.' . . . Despite convincing evidence to the contrary, Holland maintained that he could prove that he did not have a criminal record. . . . Seemingly without recognizing the inherent contradiction, he also contended that the prosecution's proceeding on the prior conviction allegations would violate double jeopardy." Courts have recognized that " ' " '[m]ore is required to raise a doubt [of competence] than mere bizarre actions [citation] or bizarre statements [citation] . . . or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense.' " ' " (*People v. Murdoch* (2011) 194 Cal.App.4th 230, 236-237.) Here, this reference to Holland's bizarre actions, without more, is insufficient evidence to establish that he was not mentally competent to represent himself.

Our review of this case is aided by the trial court's summary of its observation of Holland during the trial. Specifically, at a hearing scheduled for Holland's new trial motion, Holland claimed he had not timely filed a motion for a new trial because he was not mentally competent. The court disputed that claim, concluding Holland had not timely brought the motion. It proceeded to make a finding regarding Holland's competency during the entire trial, telling Holland: "You've played the competency rule. You played it three or four times during the trial. Every time you pretended and acted like you were incompetent, we suspended the proceedings, we had a medical commission, and they all come back, 'he's competent.' And you also argue that 'I was competent' and now when you think it's to your advantage, suddenly you're incompetent again." The court added, "You're acting perfectly rationally today for the record." In

12

effect, the court found Holland was malingering. Reviewing courts must "defer largely to the trial court's discretion" and uphold the trial court's ruling if supported by substantial evidence. (*People v. Johnson* (2012) 53 Cal.4th 519, 531 (*Johnson*).) In light of the whole record, we conclude sufficient evidence supported the trial court's finding that Holland was mentally competent to stand trial.

## II.

### *The Court Did Not Err in Denying Holland's Marsden Motion*

Holland contends the trial court abused its discretion in denying his *Marsden* motion, thus violating his state and federal constitutional rights to counsel.

A. *Background*

On November 2, 2011, the court held a *Marsden* hearing to consider Holland's request to relieve appointed counsel. Holland told the court that his counsel was "trying to play me crazy. Trying to call me ignorant." Holland said his attorney was conspiring to keep him falsely imprisoned by not filing appropriate motions. Holland added his counsel "knows good and well I should have been out of jail and the [district attorney] was trying to make a deal with me." Holland also stated his counsel "called [him] a nigger."[6]

Defense counsel responded that he would never use that ethnic slur. Further, he disagreed with the motions Holland wanted him to file. Counsel also said Holland had

---

[6]     The probation report lists Holland's ethnicity as Black.

13

requested that he offer the district attorney that he would plead guilty to a trespassing charge in exchange for time served. The district attorney rejected that offer.

The court ruled the attorney was responsible for trial tactics, including deciding what motions to file. The court also told Holland, "No matter what your offer is, counsel cannot force the District Attorney to take it." The court found no basis to relieve appointed counsel.

B. *Legal Principles*

"*Marsden* motions are subject to the following well-established rules. ' " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citations].' [Citations.]" ' [Citation.] Denials of *Marsden* motions are reviewed under an abuse of discretion standard. [Citation.] Denial 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085-1086.) A defendant who does not make this showing is not entitled to substitute counsel. (*People v. Smith* (1993) 6 Cal.4th 684, 696.)

C. *Analysis*

Here, the court did not err in concluding that it was within the attorney's purview to make tactical decisions about which motions to file. A difference of opinion between a defendant and his attorney over trial tactics does not place a court under a duty to appoint another attorney. (*People v. Lucky* (1988) 45 Cal.3d 259, 281-282.) The court also did not err in pointing out that the district attorney was not required to accept the plea deal Holland sought. In sum, there was no error. Holland's allegations were not sufficient to show that his right to counsel would be substantially imperiled without a substitution of counsel. (*People v. Walker* (1976) 18 Cal.3d 232, 238.) "The transcript clearly indicates that the trial judge made inquiry of defendant and listened to his complaints. Nothing more was required under *Marsden*." (*People v. Williamson* (1985) 172 Cal.App.3d 737, 745.)

III.

*The Court Did Not Err in Granting Holland's Faretta Motion*

Holland contends the trial court allowed him to represent himself "[d]espite [his] inability to appreciate the validity of the charges against him and his failure to perceive any viable legal or factual defense, as well as the court's own belief that self-representation was an unwise choice." Holland specifically contends: "A review of the record demonstrates [his inability] to represent himself effectively. While [he] was capable of reproducing motions and pleadings that were superficially proper in form and appearance[,] the content of those motions and the primary theory of his defense demonstrate that he was suffering from delusions and paranoia that distorted his

15

perception of reality and precluded him from defending himself in a manner sufficient to respond to the serious charges against him." Holland attempts to bolster his arguments with citations from the psychologists' evaluations of his mental competency to stand trial. He further contends "the trial court appears to have believed that [his] competency to stand trial equated to competency to represent himself."

A. *Background*

On November 10, 2011, the court extensively questioned Holland about his request for self representation, initially warning him, "Do you understand that self-representation is almost always a bad choice?" and "It's like trying to do surgery on yourself. Would you try to do that?" Holland replied that he understood.

The court specifically asked Holland a series of questions aimed at showing the disadvantages of self-representation: "Do you understand that you're going to have to abide by or live by the same rules of evidence and the same rules of procedure that the [district attorney] is going to have to abide by?" "And do you understand that because the same rules of evidence apply—even though you are not an attorney, haven't been to law school, probably don't know the Evidence Code—if you don't object due to something that you have not studied or don't understand, inadmissible evidence will come in . . . ?" "You're on your own basically. All right? You're not going to receive any special treatment if you file any pretrial motions or motions during the trial. Do you understand that?" "Do you understand you'll be up against the district attorney who has graduated from college, graduated from law school and has probably tried hundreds of more cases than you have?" "*Do you understand if you represent yourself, you cannot*

16

*raise your own incompetence as grounds for appeal?*"  (Italics added.)  "Do you understand that the district attorney has a whole staff—a whole building full of people that can help him and you're not going to have that same staff to help you with your case?"  "Do you understand that if we get close to the trial date and—because the People have a right to go to trial, just like you do—that if you decide close to the trial date that you really can't handle it, the Court does not have to relieve you?  I can make you go to trial yourself?"  "Do you understand if you misbehave and you are in pro per, I can have you removed from the courtroom and the trial can proceed without you being here?"  "*Do you understand that when you ask questions of the jurors, of the witnesses, or you argue to the jury, you run the risk or the danger of the jury reading into what you're saying and maybe presuming that you have knowledge of events or that you've tipped your hands or indicated in some way that you were present for these crimes?  That would not be a danger if you were represented by counsel.  You might say something that the jury would think, 'Oh well, if he says this, he must have been there.'* "  (Italics added.)

Holland responded to all of the above questions in the affirmative, indicating he understood the court's warnings.  The court asked him several questions regarding the charges against him, his possible punishment, and the trial court procedures to be followed.  Holland responded appropriately.  The court asked about Holland's educational background.  Holland replied he "graduated from college course at the age of, like, 17 years old."  Holland explained his degree was "for independent living.  Like I said, I got emancipated.  By the time I turned 17, I had two trades:  One for business management, another for technician.  I was already living on my own."

17

The trial court ruled:  "[Holland] is competent.  He's literate.  He is fully informed of his right to counsel.  He can express himself . . . maybe not to the extent that a lawyer can, but he is capable of making his point, at least to the court.  [¶]  The court finds that [Holland] has made a voluntary, intelligent, and understanding [waiver] of his right to be represented by counsel.  . . .  [¶]  The defendant has—understands the nature of the charges.  He understands the facts.  He is aware of the possible punishments.  And I will allow the defendant to proceed in representing himself."

Even after that ruling, the court gave Holland a final warning:  "I would just suggest that you think very long and hard about representing yourself.  I know you want to, but it's a lot of charges.  It's a complicated case.  The potential consequences for you are you never see the light of day as a free person again.  So it's a very serious thing.  So think about it.  I granted you the right to represent yourself.  I will let you change your mind on [December 2, 2011] but probably after that I won't."  On December 2, 2011, Holland declared himself to be "ready for trial."  He did not refer to the court's previous offer to reconsider his decision to represent himself.

B.  *Legal Principles*

The Sixth Amendment to the United States Constitution gives criminal defendants the right to represent themselves.  (*Faretta, supra,* 422 U.S. at p. 807.)  A knowing and intelligent waiver of the right to counsel is required before a criminal defendant is allowed to represent himself.  (*People v. Noriega* (1997) 59 Cal.App.4th 311, 319.)  The defendant should be made aware of the dangers and disadvantages of self-representation so the record shows he is making an informed choice with his eyes wide open.  (*Ibid*.)

18

The purpose of this requirement is to determine whether the defendant in fact understands the significance and consequences of his decision and whether that decision is voluntary. (*Ibid*.)  On appeal the test is not whether specific warnings or advisements were given. Instead, we examine the record as a whole to determine whether the defendant understood the disadvantages of self-representation, including the risks and complexities of his case.  (*Ibid*.)  Our examination of the record is de novo.  (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070.)

In *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*) the United States Supreme court recognized the existence of "gray-area defendants," who are mentally competent to stand trial but suffer from severe mental illness rendering them incompetent to conduct trial proceedings by themselves.  (*Id.* at pp. 174, 177-178.)  In such cases the United States Constitution gives states the option of insisting upon representation by counsel. (*Id.* at pp. 177-178.)

*Edwards* did not hold that due process requires a higher standard of mental competence for self-representation than for trial with counsel; it only allows states to impose a higher standard without violating *Faretta*.  (*People v. Taylor* (2009) 47 Cal.4th 850, 877-878.)  In *People v. Johnson, supra,* the California Supreme Court accepted *Edwards's* invitation and held that trial courts have discretion to deny a defendant's *Faretta* motion consistent with the holding in *Edwards*.  (*Johnson*, at p. 528.)  Declining to adopt a specific standard, *Johnson* held that trial courts may exercise their discretion to deny self-representation if the "defendant suffers from a severe mental illness to the point

19

where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id.* at p. 530.)

"[W]e have held that a trial court may not measure a defendant's competence to waive his right counsel by evaluating the defendant's 'technical legal knowledge' [citation] or his ability to represent himself [citation]. The right to self-representation may be invoked by any defendant competent to stand trial." (*People v. Doolin, supra,* 45 Cal.4th at p. 454.)

C. *Analysis*

Having examined the entire record of proceedings, we conclude the trial court abundantly explained, and Holland clearly understood, the disadvantages of self-representation, including the risks and complexities of his case. The trial court additionally warned Holland he would have no basis to raise an appellate claim that he was incompetent to represent himself. We believe the court did as much as reasonably possible to dissuade Holland from self-representation. (See *People v. Taylor, supra*, 47 Cal.4th at p. 891 [record clearly showed defendant chose self-representation with his eyes open to the risks and disadvantages it entailed, the nature and seriousness of the charges he faced, and his right to continue being represented by appointed counsel throughout trial].) Accordingly, we conclude Holland made an intelligent waiver of his right to counsel. The denial of self-representation must not be done lightly, or for the purpose of increased efficiency or even fairness. (*Johnson, supra,* 53 Cal.4th at p 531.)

Holland contends he was incompetent to represent himself at trial as shown by his conduct at the *Faretta* hearing, when he claimed to be a college graduate, but later stated

20

he had two trades, one for business management another for technician. The California Supreme Court addressed a similar situation in *People v. Koontz* (2002) 27 Cal.4th 1041 and found such claims by the defendant did not undermine a finding of competency: "Defendant further asserts that he made 'delusional' claims, such as an assertion that he possessed an Associate of Arts degree and had attended the University of California at Davis, that the trial court—aware that defendant had spent most of his adult life in prison—should have realized indicated he was mentally unfit to stand trial. But a proclivity to boast or exaggerate, a tendency to digress in argument, a shaky grasp of the legal concept of relevancy, even a certain tangentiality in speech patterns does not necessarily mean that a defendant lacks a rational and factual understanding of the proceedings, the basic criterion for competency." (*Koontz*, at p. 1073; see *Dusky v. United States* (1960) 362 U.S. 402.)

The same analysis applies to Holland's claim that at the *Faretta* hearing he described the charges against him as "bogus" and claimed the People did not have a "[section] 995[, subdivision] (b) packet." The defense claims, "Despite what proved to be clear evidence to the contrary, [he] insisted that he would prove that he did not have a record." He also claimed double jeopardy. Holland also alludes to his claim during the *Faretta* hearing that he "focused on the prosecution's lack of a weapon and the absence of an injury report. Ignoring the eyewitness identification and his detention near the crime scene, [he] noted that without the weapon, the prosecution had been unable to obtain any fingerprint evidence. . . . [He] then proceeded to characterize the case as 'contaminated' and 'nothing but double jeopardy.' . . . He also went on to state that the prosecution's

21

case was 'all hearsay.' . . . [¶] When the lower court asked about any legal or factual defenses [he] had, all he could say was 'so many ways this case can be beat . . . .' . . . In responding to a question about his ability to pick a jury, Holland stated, 'it would be a waste of time. If you want to go to trial, it will be a waste of time.' "

Holland argues: "A review of the record demonstrates [his inability] to represent himself effectively. While [he] was capable of reproducing motions and pleadings that were superficially proper in form and appearance, the content of those motions and the primary theory of his defense demonstrate that he was suffering from delusions and paranoia that distorted his perception of reality and precluded him from defending himself in a manner sufficient to respond to the serious charges against him." The California Supreme Court's response to a similar claim raised in *Koontz, supra,* 27 Cal.4th at p. 1070, is applicable here: "That defendant later took missteps in his self-representation . . . appears to reflect his lack of legal knowledge, not necessarily mental illness or incompetency."

Holland claims with no citation to the record: "Instead of denying [his] request for self-representation, something the trial court should have done based upon the psychological reports and its own observation, the trial court ultimately granted the *Faretta* motion, presumably believing that was its only option." But the assertion that the trial court believed it had no other options is belied by the trial court's own findings Holland was competent to represent himself at all times during trial and was in fact malingering. Specifically, at the new trial motion the court for a second time stated its perception of Holland's mental competence: "Record should also reflect that during the

22

course of all of the proceedings in this case in which this court has been involved, Mr. Holland for the most part conducted himself within the rules, and I know basically that he has the ability to do that if he chooses to do so.  I have found—I know at least three times he has acted out and one other court and this court has sent him for a [section] 1368 evaluation.  On each occasion he has been found competent to stand trial and to proceed. [¶]  This court has found in the past that he is competent, and I find that he is competent today.  It seems his habit whenever he seems thing[s] are not going his way, he decides that the best thing for him to do is act out and try to pretend like he has sanity problems and things will be delayed."

" 'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' " (*People v. Danielson* (1992) 3 Cal.4th 691, 727.)  "As with other determinations regarding self-representation, we must defer largely to the trial court's discretion." (*Johnson, supra,* 53 Cal.4th at p. 531.)  The trial court's ruling regarding a defendant's competence will be upheld if supported by substantial evidence. (*Ibid.*)  Such deference is especially appropriate when, as here, the same judge has observed the defendant on numerous occasions.  (*Ibid.*)  Here, we defer to the court's observations of Holland's conduct during trial.

IV.

*The Court Did Not Err by Limiting Holland's Oral Argument*

Holland contends the trial court prejudicially erred by violating his right to self-representation because during oral argument it prevented him from alluding to Nelson

23

Mandela's false incarceration. He specifically argues: "Just as the defense may argue that convictions based on mistaken identification occur and may cite examples, Holland also should have been permitted to note a prominent case where an individual was falsely accused and unjustly imprisoned as the result of governmental overreach and oppression. While on the surface, Nelson Mandela's political imprisonment in South Africa may not bear much resemblance to a prosecution for attempted murder and burglary in southern California, Holland should have been allowed to draw an analogy between the two since he also claimed to be the victim of false imprisonment, misconduct by law enforcement, and a corrupt prosecution."

A. *Background*

During closing argument, one of Holland's defense theories was that he was falsely imprisoned: "It's a crying shame that there's no evidence against me, and this [district attorney] is going to—still taking me to trial like this. That's crazy. False imprisonment is what it is." Holland also argued to the jury: "All of this injury, talking about [great bodily injury] and all this man, all this is propaganda. Man, it never should have went this far. False imprisonment. All this is false imprisonment, false imprisonment. Should never went this far. This is real talk. They trying [*sic*] to ruin my life. That's why I went proper [*sic*], because they trying [*sic*] to ruin my life." Holland argued to the jury that the police "[k]nowing that they put me in jail falsely instead of simply letting me out of jail, they want to plant evidence on me." Holland further argued to the jury that the police did not turn on their body cameras or recording devices: "They supposed [*sic*] to have it on, period. They supposed [*sic*] to have that on. No matter what

24

they say, they know I'm falsely imprisoned. The truth—you can't hide the truth. The truth going [*sic*] to come out regardless. False imprisonment that's all it is, nothing, no, nothing more than false imprisonment."

The trial court more than once warned Holland he was repeating himself during his closing argument and he should conclude his argument. At one point the court informed him he had 15 minutes, and then 5 minutes, to argue. Afterwards, Holland argued to the jury: "Okay. I can sum all these charges up—false imprisonment, they planted evidence on me, and I proved it. I can sum all these charges up that I'm truly innocent and in L.A. County jail, there's 15,000 inmates." The court sustained an objection to that assertion, telling Holland, he was "wasting [his] last minute." Holland then asked the judge in open court, "Can I talk about Nelson Mandela is in jail [*sic*] for 25 years falsely?" The court denied the request: "Nelson Mandela has nothing to do with this case, Mr. Holland. Argue the evidence in this case."

B. *Legal Principles*

The California Supreme Court has held that a judge in a criminal case "must be and is given great latitude in controlling the duration and limiting the scope of closing summations." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184.) "Counsel's summation to the jury must be based upon facts shown by the evidence or known judicially. [Citation.] Counsel may refer the jury to nonevidentiary matters of common knowledge, or to illustrations drawn from common experience, history, or literature [citation], but he may not dwell on the particular facts of unrelated, unsubstantiated cases." (*People v. Mendoza* (1974) 37 Cal.App.3d 717, 725 [concluding the trial court

25

did not err in denying defense request to read newspaper reports about unrelated cases in which children were reported to have fabricated accusations against innocent men].)

C. *Analysis*

Here, understood in context, the court was focused on time management when it decided to exclude Holland's proposed reference to Nelson Mandela. The court previously had remarked Holland was wasting his last remaining minute of argument. The court was not seeking to infringe Holland's right to make proper arguments. And it did not abuse its discretion in restricting Holland's closing argument. Rather, the court had given Holland repeated opportunities to argue to the jury that he was falsely imprisoned, and one more argument on that topic, this time invoking Nelson Mandela, would have been merely cumulative.

V.

*The Standard Consciousness of Guilt Instructions Are Not Erroneous*

Holland contends CALCRIM Nos. 362 and 372 consciousness of guilt instructions "embody irrational permissive inferences in violation of due process."

A. *CALCRIM No. 362*

CALCRIM No. 362 deals with false statements evincing consciousness of guilt. Holland contends his "allegedly false statement" refers to his question to Sandra upon being detected in her house: "Is this Greg's house?"

Without an objection from Holland, the court instructed the jury under CALCRIM No. 362 that "[i]f the defendant made a false or misleading statement before this trial relating to the charged crime, knowing the statement was false or intending to mislead,

26

that conduct may show he was aware of his guilt of the crime and you may consider it in determining his guilt." The court's instruction also included the following limiting language contained in CALCRIM No. 362: "If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

"A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*People v. Mendoza* (2000) 24 Cal.4th 130, 180.) In *People v. Howard* (2008) 42 Cal.4th 1000 the California Supreme Court rejected the contention CALCRIM No. 362, and its predecessor CALJIC No. 2.03,[7] invite the jury to draw irrational and impermissible inferences with regard to a defendant's state of mind at the time the offense was committed. (*Howard, supra,* at p. 1021; see also *People v. McGowan* (2008) 160 Cal.App.4th 1099, 1103-1104 (*McGowan*) ["The California Supreme Court has consistently upheld CALJIC No. 2.03 against various and sundry attacks." "Although there are minor differences between CALJIC No. 2.03 and CALCRIM No. 362 [citation], none is sufficient to undermine our Supreme Court's approval of the language of these instructions."].) We are bound to follow the decisions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

---

7     CALJIC No. 2.03 provided: "If you find that before this trial the defendant made a willfully false or deliberately misleading statement concerning the crime or crimes for which he is now being tried, you may consider that statement as a circumstance tending to prove a consciousness of guilt. However, that conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are for you to decide."

27

B. *CALCRIM No. 372*

Without objection, the trial court instructed the jury with CALCRIM No. 372: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." This instruction and its substantially identical predecessor, CALJIC No. 2.52, are authorized in appropriate cases by section 1127c, which requires the court to instruct the jury in any case in which evidence of flight of a defendant is relied upon as tending to show guilt that, if flight has been proved, the jury may infer consciousness of guilt but that such flight alone "is not sufficient in itself to establish his [or her] guilt. . . . The weight to which such circumstance is entitled is a matter for the jury to determine." (§ 1127c.)

Holland contends that, under the circumstances of this case, CALCRIM No. 372 unconstitutionally permits the jury to infer guilt from flight. In particular, he argues this instruction "tells jurors that the defendant's flight may be considered by them in determining guilt. This instruction violates due process because it equates flight with guilt rather than a mere consciousness of guilt." Holland adds in his reply brief that "consciousness of guilt suggests a more generalized perception of guilt or responsibility, such as having a guilty conscience, which is distinguishable from an acknowledgement or acceptance of actual guilt for a criminal offense. The term 'aware of his guilt' is more specific and connotes an actual internal recognition that one is guilty of a crime."

28

This precise contention has been rejected by *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, at pages 1157-1159. We find this case to be persuasive and follow it. The California Supreme Court squarely rejected a challenge to the predecessor of CALCRIM No. 372, CALJIC No. 2.52. (*People v. Mendoza, supra,* 24 Cal.4th at pp. 179-181.) *Hernandez Rios* found no significant difference between the phrasing of the two instructions and held that CALCRIM No. 372 passes "constitutional muster." (*Hernandez Rios,* at pp. 1158-1159.)

VI.

*Absence of Instruction on Elements of a Criminal Threat Was Not Error*

Holland contends the trial court prejudicially failed to instruct the jury on the elements of a criminal threat.

A. *Background*

The court instructed the jury with CALCRIM No. 1300:

" The defendant is charged in Count 3 with having made a criminal threat in violation of Penal Code section 422.

"To prove that the defendant is guilty of this crime, the People must prove that:

"1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to Sandra Briones;

"2. The defendant made the threat orally;

"3. The defendant intended that his statement be understood as a threat;

29

"4. The threat was so clear, immediate, unconditional, and specific that it communicated to Michael Briones a serious intention and the immediate prospect that the threat would be carried out;

"5. The threat actually caused Michael Briones to be in sustained fear for his own safety or for the safety of his immediate family;

"AND

"6. Michael Briones' fear was reasonable under the circumstances.

"Someone commits an act willfully when he or she does it willingly or on purpose.

"In deciding whether a threat was sufficiently clear, immediate, unconditional, and specific, consider the words themselves, as well as the surrounding circumstances.

"Someone who intends that a statement be understood as a threat does not have to actually intend to carry out the threatened act.

"Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"Sustained fear means fear for a period of time that is more than momentary, fleeting, or transitory."

B. *Legal Principles*

In *People v. Butler* (2000) 85 Cal.App.4th 745, the trial court had instructed the jury with CALJIC No. 9.94, the predecessor instruction to CALCRIM No. 1300, which has similar language. The Court of Appeal rejected a contention that an additional instruction regarding the elements of section 422 was required: "The instruction sufficiently identifies the elements of the crime that the jury was required to find to

30

convict under section 422. Further instruction on the elements of the threatened crime is unnecessary." (*Butler,* at p. 759.) The court in *Butler* explained that additional instructions regarding the elements would confuse the jury. (*Id.* at pp. 759-750.)

C. *Analysis*

Here, under *Butler*, the court's instruction with CALCRIM No. 1300 sufficed and no further instruction regarding the elements of the section 422 offense was necessary. In any event, any instructional error would be harmless beyond a reasonable doubt.

" 'Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.) So, at least to that extent, we turn to the merits of Holland's argument.

We determine whether the words used by appellant "were sufficiently unequivocal, unconditional, immediate and specific they conveyed to the victim an immediacy of purpose and immediate prospect of execution of the threat" by considering "all the surrounding circumstances and not just on the words alone." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340.) There is no requirement that the threat be unconditional, nor can we judge a threat "solely on the words spoken. It is clear by case law that threats are judged in their context." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137, fn. omitted.) "[I]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422." (*People v. Butler, supra,* 85 Cal.App.4th at p. 753.) Here, the

31

jurors found that Holland attempted to murder Sandra by choking her. The statement Holland made to Michael: "You come any closer, she dies" imparted a clear threat that the jurors properly interpreted as one to commit murder. The issue is not a close one.

D. *Section 422 is Not Unconstitutionally Vague*

Holland contends section 422 is unconstitutionally vague because it provides insufficient guidelines for law enforcement and risks arbitrary and discriminatory enforcement.

Section 422 defines a criminal threat as one that threatens commission of a crime "which will result in death or great bodily injury to another person." Holland argues the quoted language "is unconstitutionally vague because it calls upon law enforcement to evaluate the nature of threats and to determine, on a case by case basis, and under a myriad of circumstances, whether a threat is of the type which will result in great bodily injury or death."

"Statutes are presumed valid and must be upheld unless their unconstitutionality is positively and unmistakably demonstrated." (*People v. Basuta* (2001) 94 Cal.App.4th 370, 397.) "A law is void for vagueness only if it 'fails to provide adequate notice to those who must observe its strictures' and ' "impermissibly delegates basic policy matters to police [officers], judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." ' " (*People v. Rubalcava* (2000) 23 Cal.4th 322, 332.) "Inasmuch as ' "[w]ords inevitably contain germs of uncertainty," ' mathematical precision in the language of a penal statute is not a sine qua non of constitutionality." (*In re M.S.* (1995) 10 Cal.4th 698, 718.)

This issue was addressed and rejected in *People v. Maciel* (2003) 113 Cal.App.4th 679 (*Maciel*), which held that the phrase "willfully threatens to commit a crime which will result in death or great bodily injury" must be construed in context. (*Id.* at p. 685.) "[S]ection 422 does not criminalize all threats of crimes that will result in death or great bodily injury, leaving to law enforcement to determine those threats that will result in arrest. Instead, the statute criminalizes only those threats that are 'so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes [*sic*] that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety.' This language means that not all threats of crimes that will result in great bodily injury are criminalized, but only serious threats, intentionally made, of crimes likely to result in immediate great bodily injury. Moreover, the statute also includes a specific intent element: 'with the specific intent that the statement . . . is to be taken as a threat.' A statute that criminalizes threats of crimes that will result in [death or] great bodily injury with the intent to place the victim in sustained fear for personal safety or the safety of immediate family members adequately advises an individual and law enforcement of the conduct prohibited by the statute. One who willfully threatens violence against another, intending that the victim take the threat seriously and be fearful, cannot reasonably claim to be unaware that the conduct was prohibited." (*Maciel,* at p. 685.)

Holland attempts to distinguish *Maciel* by claiming it is based in part on a Nebraska case (*State v. Schmailzl* (1993) 243 Neb. 734) that involves an amended version

33

of a Nebraska statute but the original version includes language "which is so similar to that found in section 422." Holland is incorrect. The *Maciel* court's discussion of Nebraska statutes and case law consists of the following statement: "Defendant relies on a case in which the Nebraska Supreme Court voided Nebraska's criminal threats statute as unconstitutionally vague. (*State v. Hamilton* (1983) 215 Neb. 694 [340 N.W.2d 397].) The Nebraska Supreme Court was to some extent concerned with language similar to the language challenged in this case. (*Id.* at pp. 398-399.) However, the challenged Nebraska statute did not include language that the victim must take the threat seriously or any intent element. Subsequently, the Nebraska legislature adopted a new criminal threats statute modeled on the Model Penal Code and including a specific intent element. The Nebraska Supreme Court concluded that this revised statute did not suffer from unconstitutional vagueness. (*State v. Schmailzl* (1993) 243 Neb. 734 [502 N.W.2d 463, 465-467].)" (*Maciel, supra*, 113 Cal.App.4th at p. 686, fn. 3.)

Holland's argument in this case is identical to that addressed and rejected in *Maciel, supra,* 113 Cal.App.4th 679. Based on *Maciel,* we reject his argument in this case that section 422 is unconstitutionally vague.

VII.

*Treating Holland's Prior Juvenile Adjudication as a Strike Was Not Error*

Holland contends the trial court was prohibited from using his prior adjudication incurred in juvenile court to sentence him under the Three Strikes Law because he was not afforded a jury trial in the juvenile court, thereby denying him due process and the

34

right to a jury trial as provided by the Sixth and Fourteenth Amendments to the United States Constitution.

Holland recognizes that the California Supreme Court has rejected his position in *People v. Nguyen* (2009) 46 Cal.4th 1007, 1028 and we are bound by it under *Auto Equity, supra,* 57 Cal.2d at p. 455, but he raises the issue to preserve it for federal review.

VIII.

*Section 654 Does Not Bar Punishment on Both Attempted Robbery and Burglary*

Holland contends the trial court erred by failing to apply section 654 to stay the sentence on his attempted robbery (count 4) or burglary (count 5) conviction. He argues the two offenses were part of a single continuous transaction and the burglary was not completed at the time the robbery was committed.

A. *Background*

In sentencing Holland to consecutive terms, the court stated, "With respect to criteria affecting concurrent or consecutive sentences under [California Rules of Court,] Rule 4.425, the court finds that the crimes involved in this offense involved separate acts of violence and separate victims and threats of violence."

B. *Legal Principles*

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." In order to determine whether there is a single act, or a course of conduct involving multiple violations of statutes,

35

requires an examination of the intent or objective of the actor. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19.) The question is whether during a single transaction there is really only one act or one objective. (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

In *People v. Jones* (2012) 54 Cal.4th 350, the court further refined its analysis of section 654. In cases where there is but one physical act that gives rise to more than one criminal offense, the court held that such act can only be punished once. (*Jones*, at p. 358.) The offenses in *Jones* were firearms violations arising out of one act of possession which could only be punished once. However, where there is a course of conduct, as opposed to a single physical act, the multiple objectives test is still applicable. (*Id.* at pp. 359-360.) The court also observed that in a given case it may be difficult to determine whether the conduct is a single physical act, or a series of physical acts in pursuit of one objective. The court said: "In some situations, physical acts might be simultaneous yet separate for purposes of section 654." (*Jones,* at p. 358.)

In *People v. Harrison, supra,* 48 Cal.3d at page 335, the California Supreme Court explained in connection with section 654, subdivision (a): "[B]ecause the statute is intended to ensure that defendant is punished 'commensurate with his culpability' [citation], its protection has been extended to cases in which there are several offenses committed during 'a course of conduct deemed to be indivisible in time.' [Citation.] [¶] It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible."

The question of whether there were multiple acts or multiple objectives is one of fact. (*People v. Martin* (2005) 133 Cal.App.4th 776, 781.) A trial court's decision as to the existence of multiple objectives is reviewed under the substantial evidence standard of review, whether the finding is express or implied. (*People v. Osband* (1996) 13 Cal.4th 622, 730-731; *People v. Nelson* (1989) 211 Cal.App.3d 634, 638.)

Burglary requires entry into a structure with the intent to commit a felony therein. (§ 459; CALCRIM No. 1700.) "The gravamen of a charge of burglary is the act of entry itself." (*People v. Failla* (1966) 64 Cal.2d 560, 568.) It is settled that the essence of the offense is entry with the proscribed intent; such entry constitutes the completed crime of burglary regardless of whether any felony or theft actually is committed. (*People v. Allen* (1999) 21 Cal.4th 846, 863, fn. 18.)

Attempted robbery consists of two elements: (1) the intent to commit robbery and (2) "a direct but ineffectual act was committed." (§§ 664, 211.) Thus, "to be convicted of attempted robbery, the perpetrator must harbor a specific intent to commit robbery and commit a direct but ineffectual act toward the commission of the crime." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

C. *Analysis*

Here, the burglary and attempted robbery were two distinct criminal acts. After Holland had entered the house with a felonious intent, the burglary was complete. He subsequently attempted to force Sandra to give him money, thus committing the separate crime of attempted robbery. Accordingly, the court did not err by imposing separate

37

sentences on each crime, and there was no section 654 violation. (See *People v. Green* (1985) 166 Cal.App.3d 514, 518.)

IX.

*Section 654 Bars Punishment on Two Great Bodily Injury Enhancements*

Holland contends the trial court erred by failing to stay the sentence on his section 12022.7 great bodily injury enhancement on either the attempted murder (count 1) or attempted robbery (count 4) under section 654. He specifically contends: "[T]he same act of causing great bodily injury is being punished by application of the section 12022.7 enhancements since there was but a single, indivisible assault upon Sandra Briones that gave rise to the [great bodily injury] enhancements attached to the attempted murder and attempted robbery counts."

A. *Legal Analysis*

"When the criminal acts forming the basis for convictions of multiple substantive offenses are divisible—i.e., reflecting separate intents, objectives, or events—then section 654 has been held inapplicable. [Citation.] Thus, it follows that if section 654 does not bar punishment for two crimes, then it cannot bar punishment for the same enhancements attached to those separate substantive offenses. This is true even if the same *type* of sentence enhancement is applied to the underlying offenses. [¶] A sentence enhancement relates to an aspect of the substantive offense to which it attaches, not to other similar enhancements for separate criminal acts." (*People v. Wooten* (2013) 214 Cal.App.4th 121, 130 (*Wooten*).) We review the court's factual findings for substantial evidence. (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.)

38

In *Wooten,* the court rejected the defendant's claim the assault was one indivisible assault on the victim and his corresponding request that the court impose only one great bodily injury allegation.  The court described that the defendant first attempted to rape the victim, dragging her into the bathroom and having sexual contact with her there.  Afterwards, the victim escaped from the bathroom, and the defendant focused on beating her, inflicting life-threatening injuries.  (*Wooten, supra,* at p. 133.)

B.  *Analysis*

This case is distinguishable from *Wooten, supra,* 214 Cal.App.4th 121.  Here, Holland's act of choking Sandra to the point that she blacked out and his slamming her head against the counter and refrigerator and other acts of violence all shared one objective: his quest for money.  This is shown by his asking her for money before he attacked her, and when she revived from his choking her, the first thing she heard him ask was again about money.  Accordingly, the court erred by sentencing Holland separately for the great bodily injury enhancement as to both the attempted murder (count 1) and the attempted robbery (count 4).  We stay the great bodily injury enhancement on the attempted murder conviction.

DISPOSITION

We stay the great bodily injury enhancement under Penal Code section 12022.7, subdivision (a) on the attempted murder in count 1 (Pen. Code §§ 664, 187, subd. (a)). As so modified, the judgment is affirmed. The trial court is directed to prepare an amended abstract of judgment consistent with this opinion and forward a certified copy of it to the Department of Corrections and Rehabilitation.


O'ROURKE, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.